[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. The Dissolution of the Marriage
It is found that all of the allegations of defendant's amended cross complaint have been proven, that the marriage of the parties has broken down irretrievably, and the marriage is ordered dissolved for that reason.
II. The Resolution of Various Preliminary Issues Prior to the Establishment of the Marital Estate
A. Defendant's Interest in a Family Trust.
On October 8, 1981 defendant's father executed a revocable inter vivos trust agreement wherein he named a local bank trustee of his estate and provided that after his death the trustee would pay to his widow so much of the income and principal of his estate as it deemed advisable. A similar provision was made for his children. The trust further provided that the trustee was not obliged to make any payment of income or principal but that the widow should be considered the primary beneficiary of the trust, its purpose being to insure her comfort during her lifetime.
At the present time defendant's mother is alive and well and receives periodic payments from the trustee. Defendant has received $8500 form the trust since the death of her father on April 21, 1982, the last payment in the amount of $1000 being made on November 23, 1988. Plaintiff claims an interest in whatever rights defendant might have in said trust which presently is valued at $460,000. CT Page 9848
During the trial Thomas F. Moriarty, a trust officer at the bank/trustee, testified that defendant's mother was the primary beneficiary and that if any of the children requested payment it would be given consideration "depending on the financial and physical condition of the mother."
After examining the provisions of the trust agreement and reviewing all of the testimony on this issue, this court concludes that the plaintiff has no interest whatsoever in said trust and that it should not be considered part of the marital estate of the parties.
B. Defendant's Interest in Certain Gifts and an Inheritance from Plaintiff's Mother
Plaintiff, an only child, was 40 years old when he married defendant in 1984. About 1990 plaintiff was appointed conservator for his mother who later died on February 13, 1991. A Connecticut succession tax return subsequently filed by plaintiff as administrator of his mother's estate lists various bank accounts held by her in survivorship with her son in the total amount of $384,117.
On August 30, 1991 plaintiff began a series of consultations with John D. Baker of Mechanics Savings Bank relative to the investment of money inherited from his mother. Defendant was present at some of the meetings. There resulted from these conferences the establishment between August and October, 1991 of several investment amounts standing in the name of plaintiff alone or together with defendant. At the present time, as indicated by plaintiff's most current financial affidavits, there exist the following accounts:
Keystone B-1 Plaintiff alone $ 46,288
Keystone B-1 Plaintiff and Defendant $211,428
 Van Kampen Bond Plaintiff and Defendant $ 50,828 Fund
The parties separated about February 1, 1992 when defendant left the family home, and plaintiff commenced this action on May 29, 1992. CT Page 9849
At issue is whether any of the above accounts should be considered part of the marital estate of the parties.
Concerning Keystone B-1, standing in plaintiff's name alone, the court notes that the money was inherited by plaintiff less than one year before the parties separated and that at all times the account maintained its separate identity in plaintiff's name alone. It is concluded that said account, with a present balance of $46,288, should not be considered part of the marital estate.
With regard to the joint Keystone B-1 account and the joint Van Kampen Bond Fund, other considerations exist inasmuch as plaintiff here converted inherited property previously standing in his name alone to other property standing in both his and defendant's names. This conversion triggered a pivotal development — the creation of a rebuttable presumption that plaintiff intended to make a gift of that property to the marital estate. The presumption, while not conclusive, can only be overcome by clear, convincing and unmistakable evidence that no gift was intended. See Smith v. Smith, 412 N.E.2d 985 (1980 Illinois) and Carter v. Carter, 419 A.2d 1018, 1022 (Me. 1980).[1] See also Valuation and Distribution of MaritalProperty, Ch. 18 "Property subject to Equitable Distribution" by Willard H. DaSilva pp. 67-69. Such evidence is lacking here. To the contrary, the record indicates that plaintiff after the institution of the present action unsuccessfully sought to remove defendant's name from these accounts by forging her signature to a request to their brokerage house that this be done.
This court concludes that each of the latter two joint accounts should be considered part of the marital estate of the parties. The manner in which they are to be distributed will be discussed later.
C. Plaintiff Annuity
When still a teenager plaintiff began investing in an annuity in Sun Life. As near as can be ascertained, payments to this account were all made prior to plaintiff's marriage to defendant. The cash surrender value of this account is $67,969. Plaintiff has made no claim to this annuity on the evidence it is held that it should not be considered part of the marital estate.
D. Plaintiff State of Connecticut Retirement Plan
CT Page 9850
Plaintiff financial affidavit lists a retirement plan with the State of Connecticut valued at $9000. The evidence indicates that the bulk of this account accrued prior to plaintiff's marriage to defendant and this item will not be considered part of the marital estate.
E. Plaintiff's Interest in the Family Home
Plaintiff in his most current financial affidavit included as an asset equity of $50,000 in his parents' home, representing a one-half interest. After examining the various deeds pertaining to this parcel and other evidence submitted by the parties, this court concludes that plaintiff in truth is not an owner of the property and that this property should not be considered a part of the marital estate.
F. Various Promissary [Promissory] Notes of Plaintiff
Included among the assets listed on plaintiff's financial affidavit are a note from John Denz and Mark Barber in the amount of $12,000, a note from Michelle Close in the amount of $60,000 which is secured by a mortgage and a note and mortgage on his parents' home in the amount of $40,000.
The "Denz" note represented a loan of $12,000 on January 13, 1992 by plaintiff to defendant's sister's husband and friend. Defendant's mother had previously refused to make the loan. Defendant left the family home shortly thereafter. The loan is in default.
The "Close" note and mortgage represent security for a $60,000 loan made by plaintiff to Mrs. Close and her son on January 30, 1992 on the recommendation of plaintiff's attorney. This note is also in default and on the evidence chances for recovery are slim.
There is no evidence that the funds advanced by plaintiff on both transactions come from other than the inheritance from his mother. Further, in all likelihood, they are of little value. It is concluded that neither note should be valued among plaintiff's assets for purposes of distribution of the marital estate.
The "plaintiff's family home" note in the amount of $40,000 presents other problems. It is evidenced by a note and mortgage dated January 8, 1992, signed by plaintiff as administrator of CT Page 9851 his mother's estate and payable to himself individually. While the evidence is not clear on this point, the loan was probably necessary because the estate was lacking in liquid assets, consisting principally of bank accounts in joint tenancy with plaintiff as well as a half interest in the family home. It is additionally noted that a series of deeds involving plaintiff's mother's one half interest, a tax bill indicating that plaintiff possessed a half interest in the property and plaintiff's mother's will leaving her entire estate to her husband, all combine to place the state of title to the property in a decidedly cloudy category.
Considering the source of funds in this transaction, namely that they had been inherited, their purpose, and the date the loan occurred, it is concluded that these notes also should not be included as an asset of plaintiff for distribution purposes.
G. The Fair Market Value of 100 Comstock Road, Manchester, CT.
The parties are in dispute concerning the fair market value of their above described family home. Plaintiff on his financial affidavit values it at $220,000 while defendant on her affidavit and in her testimony declares its value to be $155,000
Each of the parties has had considerable experience in real estate. The court finds the evidence submitted by defendant on this issue to be more persuasive and finds the fair market value of the family home to be $171,250.
III. The Marital Estate of the Parties for Distribution Purposes
Plaintiff (husband)
A 1/2 interest in No. 100 Comstock Road, Manchester, Ct.
 Value $171,250 Less Mortgage 81,296 ________ Total Equity $ 89,954
1/2 interest $ 44,977
1973 Oldsmobile Sedan 500 CT Page 9852 Household furniture, etc. — Keystone B-1 Account 1/2 105,714 Van Kampen Bond Fund 1/2 25,414 _______ Total $176,605
Defendant (Wife)
1/2 interest in No. 100 Comstock Road $ 44,977 Manchester, CT. 1984 Chevrolet S-10 Blazer 2,000 Household furniture, etc. — Antiques — washer/dryer (pre-marital — assets) First Federal Savings 18,000 Keystone B-1 Account 1/2 105,714 Van Kampen Bond Fund 1/2 25,414 I.R.A. Pre-marital Asset $6000 — ________ Total $196,105
Total/Marital/Estate $372,710
IV. An Examination of the Evidence in Accordance with the Provisions of Sec. 46b-81c C.G.S.
a. General Background
The plaintiff husband, presently 50 years of age, and the defendant wife, now 45, were married on May 5, 1984, ten years ago. While there are no minor children of the marriage, defendant did adopt two children, Heather and Amy, now 10 and 6 years old — subsequent to the separation of the parties on or about February 1, 1992. The children, both of whom have emotional problems of long standing, had been with the parties since July, 1991 in accordance with a joint plan to adopt them. Plaintiff lost interest after the separation of the parties. Finally, in February, 1993, after repeated requests by defendant, plaintiff gave his approval to their adoption solely by her.
Plaintiff graduated from Rockville High School and thereafter satisfactorily completed a two year course of study at the Hartford Institute of Accounting. Later he attended classes at the University of Hartford. He was rejected for military service because of an ear problem. He was employed at Kaman Aircraft for CT Page 9853 three years and thereafter from 1969 until 1985 at the Connecticut Department of Revenue Service. At that time he terminated his state employment and has since been involved in the sale of real estate in the Manchester area. At the present time he is unemployed, his sole weekly income being $493 representing nontaxable income from his investments.
Defendant graduated from high school and college, later attending law school for one year. She served as administrative assistant to the mayor of Hartford from 1973 until 1977 and thereafter managed a family restaurant in Manchester. During that period she also managed to take a number of real estate courses and is presently a licensed broker and appraiser. The family restaurant was sold in 1993, and defendant's presently weekly income includes a net of $325 from her real estate activities, $7 from interest and dividends and $236 from the State of Connecticut on behalf of her two adopted children for a total weekly net of $568.
b. Health
Plaintiff states that he is in good health except for previously mentioned ear problem as well as a disability to his knee resulting from a car accident in April, 1992.
Defendant appears to be in reasonably good health.
c. Fault
A review of the court's notes of the testimony of the parties on this factor reveals the following:
Plaintiff
"In 1984 we had arguments. Once we had a scuffle. She grabbed my arm. Her fingernails went into my shirt and drew some blood. She threw a phone at me. She wanted to know why my First Federal Bank account wasn't transferred to both of us and why she wasn't beneficiary of my life insurance policy. I later named her beneficiary of my Sun Life policy but didn't change my First Federal account. We always managed to patch things up. I never hit her during our marriage."
Plaintiff believed that much family friction resulted from his growing concern for his mother's health, commencing about CT Page 9854 1988. In plaintiff's words "I requested her to let my mother come in with us. She said, `I'll move out if she moves in! A conflict resulted between us. Between February and September, 1991 things weren't good between us. The emotional support wasn't there. Sometimes she would sleep in the rec room — sometimes I'd sleep on the couch."
Concerning defendant's claim that he was away at night and that incriminating evidence was left in his car he testified that "At the time (1991) I had pressure from everywhere. There were times when I stayed away from home all night. Saturday I'd drive down to my mother's grave in Westport, put flowers on her grave and drive back. I was never with another woman. I never had condoms or cards form girlfriends in my car."
Referring to defendant's leaving the family home, plaintiff commented "there had been a series of arguments starting over the holidays. Real estate was slow. The arguments were about everything in general. We both yelled. She claimed I didn't make enough sales. The condoms and notes were brought up. She said my mother was the cause of the breakdown and that I put my mother ahead of the family. After she left on February 1, 1992 I thought the marriage could be reconciled. I called her at her mother's home but sometimes she'd hang up. I began counselling [counseling]. She said she might consider dating me again after six months if I'd move out of the house and let her move in."
On March 18, 1992 an altercation between the parties erupted when defendant returned to the family home to pick up some personal items. Plaintiff received scratches on his neck and a bruised lip. Defendant was arrested following a complaint by a neighbor who had observed the quarrel.
Lastly, plaintiff denied knowing Linda Thompson, with whom he presently resides, prior to the separation of the parties.
Defendant
Defendant's observations on the reasons for the breakdown of this marriage not surprisingly are quite different from those of plaintiff.
Defendant testified that plaintiff was less than enthusiastic about working, stopping almost completely when his mother became ill in 1989. In her words "He was capable of making money but he CT Page 9855 refused. He'd say `get it from your mother — she has plenty.' He quit his government job in 1988 while still in training. I received no money from him after February 1986. I supported him by working two jobs." Plaintiff stated that differences between the parties became more acute around September 1991. In her words "He'd call me at work, screaming at me. He'd bring the children into the restaurant and disappear; returning home at 5 or 6 a.m. He was gone two other times a week. It became more frequent as time went on. He'd sit in a chair with a suitcase with his mother's clothes. He'd go from room to room with them. He'd say `I have no family'. I once told him his relationship with his mother wasn't a normal one. He'd go to single bars with male friends. He went to a down hill ski place with cross country skis. I found condoms and cards from girlfriends in his car. I confronted him about this, asking him why he was doing this to me. He'd hide the phone bills. He'd say `If you don't like it get the hell out'. When I asked him to go to a movie with me he said I wasn't worth the price of a ticket. He told me he never knew a girl named Linda but he's living with her now."
With reference to what transpired the day defendant left plaintiff she stated "He called me at work asking me to get a baby sitter because he was going out. When I couldn't get one he swore at me and threw things. I couldn't take it anymore. I left with the children. After I left I spoke with him. At times he was nice, at others he'd scream to me about his mother. He never apologized for the way he acted."
Having reviewed all the evidence relating to responsibility for the breakdown of the marriage the court finds that without question it rests with plaintiff.
d. The Contributions of the Parties to the Marital Estate
The principal assets in this marital estate are the family home together with related personal property acquired by the parties during their eight years together on the one hand and two investment accounts originating in the summer of 1991 from plaintiff's inheritance on the other. It is clear from the evidence that the parties did not make equal contributions, in whatever way and whatever the percentage, to each of these principal assets. For this reason each of these groups will be discussed separately. CT Page 9856
The following is noted with reference to the marital estate after excluding therefrom the joint investment accounts comprising plaintiffs inheritance but including the family home, various other vehicles and defendant's savings account:
Year Plaintiff's Earnings Defendant's Earnings
1985 $29,250 $ 28,080
1986 7,306 32,920
1987 None 34,950
1988 3,376 34,300
1989 6,769 33,800
1990 10,802 33,800
1991 None from Employment 36,976
The above statistics together with other testimony on this issue leads inescapably to the conclusion that defendant's contributions to this portion of the marital estate far and away exceeds that of defendant.
Regarding the investment accounts, it is equally obvious that plaintiff made these contributions to the marital estate with very little assistance from defendant.
e. Future Opportunities
The parties have an equal opportunity for the future acquisition of capital assets and income.
Conclusion
After examining all of the evidence as it relates to Sec. 46b-81c C.G.S. and after giving particular consideration to such predominating factors as the causes for the dissolution of the marriage and the comparative contributions of the parties in the acquisition, preservation or appreciation in value of the marital estate it is ordered that said estate be divided between the parties as follows: CT Page 9857
A. The Marital Estate Excluding Total $110,454 The Joint Investment Accounts Value (Inheritance)
Plaintiff 20% $22,091
Defendant 80% $88,363
B. The Joint Total $262,256 Accounts Value
Plaintiff 67% $175,712
Defendant 33% $ 86,544
Total $372,710
C. Total Amount of Total Marital Estate to be Received by Each Party
Plaintiff $197,803
Defendant $174,907
$372,710
V. The Distribution of the Marital Estate in Accordance with the Findings Made in Article IV (supra)
Total Marital Estate $372,710
Plaintiff's Share $197,803
 There is awarded to Plaintiff the following:
1973 Oldsmobile Sedan $ 500
Van Kampen Bond Fund $ 50,828
Portion of Keystone B-1 Account 146,475
 Household furniture Possession — _______
Total $197,803 CT Page 9858
Defendant's Share $174,907
 There is awarded to defendant the following:
 Whole Interest in the 100 Comstock Road $89,954 Manchester, Connecticut — Total Equity
1984 Chevrolet Blazer 2,000
Household Furniture etc. in —
Washer/dryer — antiques (pre-marital asset) —
First Federal Savings 18,000
I.R.A. pre-marital asset $6000 —
 Portion of Keystone B-1 Account 64,953 ________ Total $ 174,907
 Recapitulation:
Plaintiff's Share $197,803
 Defendant's Share $174,907 ________ Total Marital Estate $372,710
VI. Supplemental Orders Relating to the Distribution of the Marital Assets
 A. Plaintiff shall quit claim all of his interest in No. 100 Comstock Road, Manchester, Connecticut to defendant who in turn shall hold plaintiff harmless with regard to the mortgages and any other encumbrances on said premises.
 B. The parties shall execute all documents necessary to carry out the orders of this court.
 C. To the extent that such articles can be located, plaintiff is ordered to return to defendant forthwith all her personal papers, engagement ring and personal CT Page 9859 property removed from the marital premises between February, 1992 and February, 1993.
VII. Other Orders
 A. No award of alimony or cousel [counsel] fees is made to either party.
B. Additional Amounts Due the Defendant from Plaintiff
1. The 1989 Chevrolet Station Wagon Transaction
The Court finds the facts surrounding this issue somewhat confusing. Defendant in her proposed orders seeks reimbursement from plaintiff for half the fair market value of $8000 for a 1989 Chevrolet Wagon sold by plaintiff. On defendant's financial affidavit she lists a similar vehicle, valuing it at $9000 with her having a one half interest. Plaintiff on his financial affidavit values a 1989 Chevrolet Wagon at $6500 with his having a whole interest in it. The parties agree that this vehicle was sold by plaintiff for $6500 on January 23, 1993 as indicated by a bill of sale made part of the evidence.
Inasmuch as the vehicle has been sold, to list it as a marital asset on a financial affidavit has resulted in considerable bewilderment on the court's part. The possibility was considered that there were perhaps two similar vehicles. At any rate, on the evidence this court finds that plaintiff sold a marital asset of the parties for $6500 and that defendant, in accordance with the findings in Article IV (supra), is entitled to 80 percent of said asset. Plaintiff is therefore ordered to pay defendant the sum of $5200 on this transaction.
2. The Car Tax Issue
On October 4, 1993 defendant paid the Town of Manchester the sum of $782 representing delinquent property taxes on a motor vehicle owned jointly by the parties but used solely by plaintiff. Apparently the tax collector applied defendant's payment to the most delinquent bill rather than to her own car. Plaintiff is therefore ordered to reimburse defendant in the amount of $782 on this transaction.
3. Delinquent Mortgage Payments
CT Page 9860
When defendant returned to the family home in February, 1993 she was required to make mortgage payments in the amount of $4800 representing a delinquency for the period November, 1992 through January, 1993 when plaintiff occupied the premises. Defendant is of course entitled to be reimbursed by plaintiff for this amount and the appropriate order is hereby issued.
Plaintiff in his proposed orders requests that defendant be ordered to reimburse plaintiff for $6400 representing one half of the household carrying charges for the period March 1992 through October 1992.
Quite simply, plaintiff had the sole and exclusive use of the family home during this period while defendant and her two small children lived with her mother. Plaintiff's request is rejected by the court.
4. Summary of the Above:
Plaintiff is ordered to pay defendant the following additional amounts:
1989 Chevrolet transaction $ 5200
Car Tax Issue 782
 Delinquent Mortgage payments 4800 ________ Total $10,782
Said sum of $10,782 shall be deducted from plaintiff's share of the Keystone B-1 account and added to that of defendant leaving plaintiff with a balance in said account of $135,693 and defendant with a balance of $75,735.
C. Liabilities
Each of the parties shall be solely responsible for all liabilities listed on his or her financial affidavit and shall hold the other party harmless in that regard.
D. Defendant's maiden name of Karen Parciak shall be restored to her.
By the Court CT Page 9861
John D. Brennan State Judge Referee